IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHARLES LEWIS SR. and
MARIANNE LEWIS,

                               Plaintiffs,

    v.

COLUMBIA COUNTY and
MATTHIAS ELSON,

                        Defendants.

OPINION and ORDER

23-cv-77-jdp

---

Columbia County Sheriff's Deputy Matthias Elson lawfully stopped plaintiffs Charles and Marianne Lewis for speeding. Elson prolonged the stop to wait for a K-9 unit to come to the scene for a drug sniff of the Lewises' vehicle. The dog alerted. The Lewises were detained while the car was thoroughly searched. No drugs were found. The Lewises were ticketed and released after being held for about an hour and 15 minutes.

The Lewises do not contest the initial stop. But they allege that Elson violated the Fourth Amendment by prolonging the stop without the required reasonable suspicion of illegal drug activity. Both sides move for summary judgment. Plaintiffs ask for partial summary judgment that Elson did not have reasonable suspicion to prolong the stop. Dkt. 19. Elson asks for summary judgment that he had reasonable suspicion, and that even if he did not, he is entitled to qualified immunity. Dkt. 23.

The court will grant the Lewises' motion and deny Elson's. Reasonable suspicion is an objective inquiry, based on the totality of the information available to the officer. Elson did not have reasonable suspicion that the Lewises were engaged in illegal drug activity. And

because Elson did have even arguable reasonable suspicion, he is not entitled to qualified immunity. The case will proceed to trial on damages.

## UNDISPUTED FACTS

The following facts are undisputed except where noted.

Charles and Marianne Lewis are a married mixed-race couple from Milwaukee. At the time material to the case Charles was 59; Marianne was 64. On a Friday evening in July 2022, the Lewises were travelling on State Highway 16 in Columbia County for a weekend trip to the Wisconsin Dells. Charles was driving, with Marianne in the passenger seat. Columbia County Sheriff's Deputy Matthias Elson, who had completed training at the end of May, observed them speeding while he was traveling the opposite direction on the two-lane highway. He activated his lights and made a U-turn to catch up to them.

Once Elson caught up to the couple, he activated his siren to have them pull over. Charles pulled over, coming to a full stop approximately 30 seconds after Elson turned on his siren.  Dkt. 25-2 (Elson dash camera 2:36–3:05). Charles pulled over to the edge of the paved portion of the shoulder, but his car was not completely off the road. Elson twice ordered him to move fully off the roadway using the squad car's loudspeaker. Charles pulled forward onto the gravel shoulder. Elson determined that the registration was expired and he saw that Charles, who is Black, was looking at him through the driver side mirror.

Elson approached the car from the passenger side window. Elson asserts that he smelled the strong odor of cologne or perfume when he walked up to the car. (The Lewises dispute that there was any such odor, but for purposes of this order, the court will accept Elson's view of the fact.) Elson spoke to the Lewises through Marianne's window. He said that he pulled them

2

over for speeding and asked why they were speeding. Marianne responded that they were lost. She asked for directions to the motel in the Dells at which they had a reservation and apologized. Elson responded that they would get to the Dells by going straight down the highway, informed them that their registration was expired, and asked for Charles's license. He also asked where they were coming from. After Marianne responded that they were from Milwaukee, Elson asked for identification from her as well. Elson asked Charles to confirm that the address on his license was current, and, as Elson began to look at Marianne's license, Charles said (without being asked) that Marianne was his wife. Elson then asked for Charles's phone number. Charles did not have his number memorized; he passed his cell phone to Marianne to read the number off a piece of tape on the back of his cell phone. Elson returned to his squad car to run the licenses and write the citations. The court has reviewed Elson's bodycam video, and the Lewises were polite and composed through the entire interaction.

When Elson ran Charles's license, he learned that Charles had been convicted of a drug offense in 2008. After learning of Charles's prior conviction, Elson requested that a K-9 unit with a drug dog come to the scene to investigate the Lewises for illegal drug activity. Elson started writing traffic tickets for speeding and the expired registration, went back to the Lewises' car to ask for their insurance information, and then returned to his car, where he finished writing the traffic tickets and waited for the K-9 unit.

About half an hour after Elson pulled the Lewises over, the K-9 unit arrived. Elson told the K-9 deputy that he was suspicious of drug activity because of Charles's previous conviction for distribution of cocaine, the speeding, Marianne's statement that they were lost, that Charles looked at him while he was approaching the car, and that Charles volunteered that Marianne

3

was his wife without being asked. Elson summed up his assessment of the stop by saying, "it's all just a little odd to me." Dkt. 25-1 (Elson body camera 31:19–32:30).

The K-9 deputy approached the Lewises' car and asked if they had any illegal drugs in the car. They said no, but that Marianne had prescription oxycodone. The deputy then had his dog sniff around the car. The dog alerted. The deputies removed the Lewises, one at a time, from their car, and placed them in the back of Elson's squad car while the deputies searched the Lewises' car and belongings. The search lasted about 25 minutes. The deputies did not find any drugs or illegal contraband. Once the deputies completed the search, Elson returned the Lewises to their car and gave them a ticket for the expired registration.

ANALYSIS

The Lewises contend that Elson violated their Fourth Amendment rights by extending the legal traffic stop to investigate them for illegal drug activity. The Fourth Amendment prohibits unreasonable searches and seizures. Temporary detentions, including traffic stops, are seizures. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). A traffic stop that is lawful at its inception can violate the Fourth Amendment if it is "prolonged beyond the time reasonably required to complete" the initial mission of the stop. *United States v. Rodriguez-Escalera*, 884 F.3d 661, 668 (7th Cir. 2018) (citations omitted). "[A] dog sniff is not fairly characterized as part of the officer's traffic mission." *Rodriguez v. United States*, 575 U.S. 348, 356 (2015). So Elson's decision to prolong the traffic stop was unlawful unless he had reasonable suspicion of criminal activity independently sufficient to justify a seizure.

## A.  Reasonable suspicion

Reasonable suspicion exists if a deputy has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cole*, 21 F.4th 421, 433 (7th Cir. 2021) (en banc) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)). Conduct that is by itself lawful may contribute to reasonable suspicion, but officers must "refrain from using criteria so broad as to subject 'a very large category of presumably innocent travelers' to 'virtually random seizures.'" *Id.*, at 435 (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)). A court "need not accept all of an officer's proffered justifications at face value." *Rodriguez-Escalera*, 884 F.3d at 669. The "determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000), and when evaluating reasonable suspicion, courts must consider the totality of the circumstances, *United States v. Cortez*, 449 U.S. 411, 417 (1981). A "divide-and-conquer analysis" that examines each factor supporting reasonable suspicion in isolation is not permitted. *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018). This does not mean, however, that courts are barred from discussing the factors separately. *Rodriguez-Escalera*, 884 F.3d at 668. It simply requires that courts consider the reasonable inferences that a deputy could draw from the objective facts in combination. *Id.*

Elson contends that he had reasonable suspicion of drug trafficking based on the following: Elson was patrolling an area with a lot of drug activity; Charles was speeding and didn't immediately pull off completely off the road when Elson turned his siren on; Charles was looking at Elson instead of searching for his license and registration after he pulled over; there was a strong odor of cologne or perfume when he approached the car; Marianne's statement that they were lost was an irrational explanation for speeding; Charles said Marianne

was his wife without being asked; Charles had his phone number taped to the back of his phone, which Elson considered to be a sign of a burner phone typical for drug traffickers; and Charles had previously been convicted of a drug offense.

Elson's subjective view that it was "all just a little odd" is of no import. Reasonable suspicion is judged objectively. The court finds that, viewed from the perspective of a reasonable officer, most of the indicia cited by Elson are benign things that characterize "a very large category of presumably innocent travelers." *Reid*, 448 U.S. at 441.

The Lewises' behavior during the traffic stop was innocuous and not a basis for reasonable suspicion that they were trafficking drugs. The video from Elson's squad car shows that the Lewises began braking and pulling over within 10 seconds of Elson activating his sirens and that they came to a stop within 25 seconds, with the car as far to the right as it could be without leaving the paved part of the shoulder and pulling onto the gravel. Dkt. 25-2 (Elson dash camera 2:36–3:05). This is a reasonable time to come to a stop, and nothing about Charles's stopping on the pavement suggests criminal activity. It is clear from Marianne's tone of voice and questions to Elson that, when the stop started, she was worried about being lost and earnestly asking Elson for directions to their hotel. Dkt. 25-1 (Elson body camera 5:02–6:56).

Charles's conduct, too, is entirely benign. Looking at an officer as he approaches the car is not objectively suspicious. Elson says that it would have been more normal for Charles to have been searching for his license and registration. But it is not hard to imagine that, if he had been rummaging around in the car, Elson could have thought it suspicious that Charles was searching for an unknown item. *United States v. Broomfield*, 417 F.3d 654, 655 (7th Cir. 2005) ("Whether you stand still or move, drive above, below, or at the speed limit, you will be

described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited."). Elson was an armed law enforcement officer approaching the Lewises' car; there is nothing suspicious in Charles watching Elson approach and waiting for directions to avoid doing anything that Elson might find threatening. Charles volunteering that Marianne is his wife was likewise innocuous, especially in the context of when he made that statement. Elson began looking at Marianne's license immediately after asking if Charles's license had an accurate address. Dkt. 25-1 (Elson body camera 6:30–6:38). The commonsense explanation for why Charles chose to say Marianne is his wife at that moment is that it explains their relationship to each other and conveys that they share an address, which was relevant to the question that Elson had just asked.

The odor of cologne or perfume that Elson says he smelled when he approached the car is at best a weak indicator of drug trafficking. (The Lewises dispute that there was any such odor, and the K-9 deputy, who also approached the car, did not corroborate it. But the court credits Elson's statement for the purposes of the Lewises' motion.) The presence of a strong odor that can mask the smell of drugs can be relevant to the totality of the circumstances when assessing reasonable suspicion. *See Rodriguez-Escalera*, 884 F.3d at 670 ("an excessive air freshener presence in a vehicle can, in combination with other indicators of drug trafficking or concealment, justify extending a stop"). But Elson didn't see excessive air fresheners, which are attached to a vehicle that might hold the lingering smell of marijuana. He says he smelled cologne or perfume, worn on the person. And wearing cologne or perfume is common lawful activity that does not suggest unlawful activity.

As for Charles's speeding, defendants concede that many people speed on State Highway 16. And many drivers who speed are not involved in drug activity. One might infer that those with illegal drugs in their cars would be even less inclined to drive significantly over the speed limit to avoid getting stopped. And it is not illogical that someone would speed while lost, if the person were worried about getting somewhere on time.

The court concludes that only three of the reasons Elson cites provide any objective support for a reasonable suspicion of illegal drug activity: (1) that he was patrolling an area with a high levels of drug activity, (2) that Charles had a piece of tape with his phone number on the back of his phone, and (3) that Charles had a past conviction for a drug crime. But there are other facts that erode the weight that could reasonably be given to each of these reasons.

First, that the stop occurred in an area of high drug activity is a factor that could contribute to reasonable suspicion. But this factor is vague and weakly supported in this case. Elson says that "[f]rom my training and experience, I know Highway 16 is known for having a lot of drug activity." Dkt. 25 ¶ 5. There's no further explanation for why Highway 16, as opposed to any of the other highways that cross Columbia County, has a lot of drugs. Elson could have learned this background only from his training, and not from his scant experience as a patrol deputy. Highway 16 runs diagonally from the southeast corner of Columbia County to the Dells in the northwest corner of the county, so it would be a common route for any drivers who choose to take a scenic alternative to the interstate to get to the Dells from Milwaukee. A general suspicion that drivers on Highway 16 are involved in drug trafficking sweeps in many innocent people who have perfectly benign reasons for driving on a country road. Its value as a basis for a reasonable suspicion of drug activity is minimal.

Second, the use of a burner-type phone would be a reasonable basis for suspecting drug activity, because multiple burner phones are commonly used by drug traffickers. And putting a label with the number on a phone might suggest that it is a burner phone. But from the video from Elson's body camera its clear that Charles's phone is a smartphone in a large protective case, which is not a typical burner-type phone. Dkt. 25-1 (Elson body camera 6:44–6:58). There's no indication that Charles had multiple phones. It's not surprising that a 59-year-old man might have his phone number written on his cellphone. Any suspicion created from the number taped to the back of the phone is mitigated by the totality of details about the phone's appearance and its owner.

Third, Charles's past conviction for drug distribution would contribute to reasonable suspicion that he was engaged in drug trafficking at the time of the traffic stop. But criminal history alone is insufficient to establish reasonable suspicion. *United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005). And Charles's criminal history was stale. His last conviction was in 2008, and he completed probation for that conviction more than 11 years before the traffic stop. The fact that Charles had been off probation for more than a decade reduces the value of Charles's criminal history in assessing whether there was reasonable suspicion that he was engaged in illegal drug activity at the traffic stop.

In considering the totality of the circumstances, a useful point of comparison is *United States v. Rodriguez-Escalera*, 884 F.3d 661 (7th Cir. 2018). *Rodriguez-Escalera* also involved a traffic stop extended to conduct a drug search. The district court granted a motion to suppress, concluding that the officer did not have reasonable suspicion to extend the stop. The officer gave the following reasons to support his suspicion of drug trafficking: the couple in a traffic stop were coming from Los Angeles, a known drug distribution center; they appeared

nervous; their stories about where they were going did not initially match up; the male passenger did not make eye contact with the officer; and there were multiple air fresheners in the car. *Id.* at 669. The court of appeals affirmed the district court's decision, holding that there was no clear error in the district court's finding that the couple did not act suspiciously nervous and that the objective facts the officer observed did not create reasonable suspicion. *Id.* at 671. The court explained that the officer's reasons "fell short of giving him a reasonable basis for believing that criminal activity was afoot" because the air fresheners and fact that the couple came from Los Angeles could describe a large category of presumably innocent travelers. *Id.* And the initially conflicting travel plans became less probative after the couple's responses to the officer's questions provided a plausible explanation for the discrepancy. *Id.*

Like the couple in *Rodriguez-Escalera*, the Lewises answered all the officer's questions and complied with all requests without appearing suspiciously nervous. If anything, the statements from the couple in *Rodriguez-Escalera* were more suspicious than any conduct by the Lewises because the driver said that they were going to New York and the passenger said they were going to Pennsylvania. It was only after further questioning that the driver explained that the trip to New York was a surprise. The presence of air fresheners and travel from an area with high drug activity are directly analogous to this case.

The two material differences between *Rodriguez-Escalera* and this case are Charles's criminal history and the number taped to his phone. But criminal history alone does not establish reasonable suspicion. *Johnson*, 427 F.3d at 1057. And, as discussed above, the fact that the phone was a smartphone in a large protective case mitigates the suspicion created by the number on the tape. And without other reasons to suggest current drug activity, Charles's stale drug conviction and number taped to his phone do not establish reasonable suspicion.

*Rodriguez-Escalera* and this case are not identical in all facts, but on balance they are highly similar. The court concludes, based on the totality of the evidence available to Elson, that a reasonable officer would not have had reasonable suspicion to extend the traffic stop to conduct a drug search.

## B.  Qualified immunity

Elson contends that he is entitled to qualified immunity because a reasonable officer in his position could have believed that there was reasonable suspicion to justify extending the traffic stop for a dog sniff. Qualified immunity shields government officials who make good-faith mistakes in the performance of their duties. Qualified immunity protects government officials from individual liability under 42 U.S.C. § 1983 unless two elements are met: (1) the official violated a federal statutory or constitutional right, and (2) the unlawfulness of the official's conduct was clearly established at the time of the violation. *Bradley v. Vill. Of Univ. Park, Illinois*, 59 F.4th 887, 904 (7th Cir. 2023) (citing *Wesby*, 583 U.S. at 62–63). Once a defendant properly raises qualified immunity as an affirmative defense, the burden shifts to the plaintiff to defeat it. *Leiser v. Kloth*, 933 F.3d 696, 701  (7th Cir. 2019), *cert denied*, 140 S. Ct. 2722 (2020).

The constitutional principle here is clear: an officer may not prolong a traffic stop to conduct a dog sniff unless the officer has reasonable suspicion of criminal activity that would independently justify a seizure. *See Rodriguez-Escalera*, 884 F.3d at 668 (discussing the rule set out by the Supreme Court in *Rodriguez,* 575 U.S. at 355–58). Thus, the dispositive question for qualified immunity in this case is whether a reasonable officer could have believed that there was reasonable suspicion to extend the traffic stop for the dog sniff. This is sometimes phrased as whether there was "arguable reasonable suspicion." Arguable reasonable suspicion

11

is established "when 'a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question could have reasonably believed that [reasonable suspicion or] probable cause existed in light of well-established law.'" *Minett v. Overwachter*, 433 F. Supp. 3d 1084, 1092 (W.D. Wis. 2020) (citing *Fleming v. Livingston County, Illinois*, 674 F.3d 874, 880 (7th Cir. 2012)).

The court concludes that this is not a close case, in which a reasonable officer could have made a good-faith error in judgment about the existence of reasonable suspicion. Elson was swayed heavily by Charles's conviction for a drug crime. But that conviction was old, and the other factors cited by Elson were flimsy ones. As explained above, most of the factors were benign, and those that might have factors that generate suspicion were undermined by the fuller factual context. No officer familiar with *Rodriguez-Escalera* could have had reasonable suspicion of drug trafficking when the Lewises were stopped for speeding.

There was no arguable reasonable suspicion that the Lewises were engaged in drug trafficking. The court will deny Elson's motion for summary judgment based on qualified immunity.

## C. Columbia County

One issue remains. Defendants contend that Columbia County should be dismissed because it is not a proper defendant. The Lewises do not contend that Columbia County violated their rights through any county policy or practice. Rather, they named the county as a defendant for the sole purpose of obtaining a declaration that under Wis. Stat. § 895.46 the County is required to indemnify any of its employees who are found liable for conduct committed in the scope of their employment. This court has allowed plaintiffs to preoceed against municipal defendants for this purpose. *See Voegeli v. City of Janesville*, No. 20-cv-845-

JDP, 2021 WL 4501837, at *4 (W.D. Wis. Oct.1, 2021) (allowing municipal defendant to remain in the case for this purpose); *Est. of Smith by Bryfczynski v. Oneida Cnty.*, 541 F. Supp. 3d 903, 917 (W.D. Wis. 2021) (same). The court will keep Columbia County in this case but will not identify it as a defendant at trial.

ORDER

IT IS ORDERED that:

1. Plaintiffs' motion for partial summary judgment, Dkt. 19, is GRANTED.

2. Defendants' motion for summary judgment, Dkt. 23, is DENIED.

3. The case will proceed to trial on damages.

Entered April 26, 2024.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge